511 So.2d 575 (1987)
Cyrus BISCARDI, Appellant,
v.
STATE of Florida, Appellee.
No. 85-1541.
District Court of Appeal of Florida, Fourth District.
April 8, 1987.
*576 H. Dohn Williams, Jr., of H. Dohn Williams, Jr., P.A., Fort Lauderdale, and Melvin S. Black, Miami, for appellant.
Robert A. Butterworth, Jr., Attorney General, Tallahassee, Sarah B. Mayer and Diane Leeds, Asst. Attys. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
This is an appeal from a conviction for armed kidnapping and simple assault, arising out of the same incidents which are the subject of our decision being issued simultaneously in Huhn v. State, 511 So.2d 583 (Fla.App. 1987), and with the PCA issued by another panel of this court in Mones v. State, 485 So.2d 9 (Fla. 4th DCA 1986).
Prior to trial and again during trial, Biscardi unsuccessfully sought severance of his trial from those of the codefendants, Huhn and Mones.
In Biscardi's pretrial motion for severance, he summarized the facts which he believed justified severance, saying that he and the victim, Fiola, had been hired to drive a large quantity of cocaine to California; that they had turned the car with the contraband over to someone there and flown back to Fort Lauderdale; that later they flew back to San Francisco to pick up the car and drive it back; that nearly $500,000 in cash had been sewn into the car's rear seat cushions; that on the return trip, there had been no prior plan to stop at Turkey Lake Plaza on the Florida Turnpike, but Fiola told Biscardi to stop there, and while Fiola was in the restroom, two armed men hijacked the car with Biscardi aboard; that they threw Biscardi out of the car at the next Turnpike exit and drove off with the car and the cash; and that Fiola had arranged for this hijacking in a conspiracy with Jimmy Varone, Carl Sarrow (or Simone) and Paul Costello.
The main point of appellant's severance motion was that when he and Fiola got back to Biscardi's Miramar home, Eduardo Huhn was waiting for them with a gun, and threatened to kill them both, and their respective families, if he did not get his money back. After an unsuccessful attempt to find the hijackers in the Orlando area, they returned to Broward County. Biscardi called Huhn, and told Fiola he had to accompany Biscardi to Biscardi's home. When Fiola tried to leave Biscardi's home Biscardi kept him there to wait for Huhn's arrival, by exhibiting a small calibre gun. Huhn arrived with three others. Huhn accused Fiola of conspiring to commit the robbery and threatened to kill Fiola unless the money was returned. Fiola's hands and feet were then handcuffed. Another man arrived. He threatened to kill Fiola unless the money was returned.
*577 When the various men left, Biscardi was ordered to stand guard over Fiola. Biscardi told Fiola he had put him in a "hell of a spot" and that Fiola would get $50,000 if the money was returned. Fiola denied involvement in the robbery and asked to be released, but Biscardi said he would be killed if he released Fiola. Ultimately Fiola admitted being an accomplice in the robbery and agreed to telephone Carl to try to get the money back. Carl did not answer the phone.
The next afternoon Huhn and another of the men returned. Again they threatened to kill Fiola unless he cooperated. Fiola agreed to call Jimmy Varone, and did so. Varone said he had not seen Carl in four days. Huhn got on the phone and said Jimmy had until 11 a.m. the next day to return the money, or Jimmy's gas station would be blown up and his family killed.
Late that day or early the next day Huhn again returned with one of the other men. Again Fiola was threatened. Huhn and the other man then left. Biscardi fell asleep and Fiola called the 911 number. The Miramar police came. They freed Fiola and detained Biscardi.
All of the above facts were derived from either Biscardi's deposition or Fiola's sworn statement to the police.
Biscardi's theory for severance was that he would assert a defense of coercion and duress by Huhn and his cohorts, and since his interests were antagonistic to Huhn's he should not be tried with Huhn.
Huhn denied that he had forced Biscardi to commit any criminal action towards Fiola or that he personally had committed such an action against Fiola.
Biscardi also moved for severance during trial, based on Fiola's testimony about threats from Huhn when he and Biscardi first returned without the car; about his and Biscardi's expressed fears they and their families would be killed, when they were unable to find the car, and the threats and actual violence after they returned from the unsuccessful search. Fiola testified that Biscardi told him Biscardi would suffer the same fate as Fiola if Biscardi did not detain Fiola as ordered.
Biscardi also proffered that Fiola would testify he had been in hiding and in protective custody since the incident, and that anyone who incriminated Huhn would be in grave danger. Biscardi also called attention to testimony of Detective Mantesta that Fiola's initial refusal to cooperate was based on fear for his own and his family's safety. Mantesta testified that the day the police rescued Fiola, Biscardi said he was (himself) a dead man because through his negligence Fiola had been able to contact the police. Biscardi said to Mantesta he had not realized he had gotten in over his head; that the people he was dealing with were "big time" and capable of doing anything.
Mantesta also testified Biscardi tipped off the police that Huhn and the others would be returning to Biscardi's house that evening, and that they were very dangerous. Biscardi gave Mantesta the keys to his house, and permission to hide there and wait for Huhn.
Biscardi proffered testimony of Mantesta that Mrs. Biscardi had called the police because she feared for her own and her family's safety, and that police surveilled the house while she and family members removed their clothing from the house. Biscardi also proffered testimony of FDLE agent Coffey about Fiola's initial refusal to cooperate because of fear for his safety, and about the armed protection given Fiola since he agreed to cooperate, because of fear of reprisal from Huhn.
Counsel for Biscardi said in appellant's initial brief that Biscardi instructed him not to assert the defense of coercion and duress in a joint trial, for fear of reprisal.
It was Huhn's testimony he had known Fiola for about eleven years, as one who did carpenter and painter work in Huhn's shoe store chain. Fiola had asked for large loans to pay off loan sharks whom he owed gambling debts, but Huhn had turned him down. Huhn denied having a gun or threatening Biscardi and Fiola when they told him about being robbed of a car loaded with money, or the next day when Biscardi called him to come to his house for advice. *578 Huhn denied being in any way involved in drug and money transportation with Fiola and Biscardi.
After his severance motions were denied, Biscardi moved for a separate jury to try his case. This was also denied.
After jury selection, Biscardi moved the court to allow the jurors to take notes. The court denied the motion. Appellant also sought some changes in the jury instructions because he had certain objections, prior to the jury's retiring to deliberate, but to no avail.
The issues restated are:
I. Whether the trial court erred in that appellant's trial should have been severed from codefendant, Huhn's, because their defenses were antagonistic. We conclude it did not.
II. Whether the trial court erred in that appellant should have been tried by separate jury from that which heard the case against his codefendant, Huhn. We conclude it did not.
III. Whether the trial court's indication to the jury that there was no provision for reinstruction of the jury or review of testimony was error, particularly when the court had refused to tell the jury, early in the trial, that they could take notes. We conclude it did.
IV. Whether the trial court erred by giving an incomplete instruction on the defense of coercion and duress. We conclude it did.
V. Whether the court erred when it commented to the jury, as the court was about to instruct on the lesser included offenses of kidnapping, that the jurors had probably already decided on the verdict. We conclude it did not, but we comment thereon.
VI. Whether the court erred in implying to the jury that it must reach a verdict, thus depriving appellant of the benefit of having a hung jury. We conclude it did not, but we comment thereon.

I

DENIAL OF SEVERANCE
Granting or denying a motion for severance is ordinarily a discretionary matter for the trial court. Crum v. State, 398 So.2d 810 (Fla. 1981). Thus, for example, in a first degree murder prosecution, the defendant was not entitled to severance of his trial from that of his codefendants because their testimony directly contradicted his alibi testimony and asserted he shot the victim, so long as the appellant had had a full opportunity to confront and cross-examine each of the witnesses against him, and he was not surprised at trial by the codefendants' testimony. McCray v. State, 416 So.2d 804 (Fla. 1982). See also O'Callaghan v. State, 429 So.2d 691 (Fla. 1983).
Old case law states that where the defenses or interests of two or more persons charged jointly are antagonistic, severance should be granted. Suarez v. State, 95 Fla. 42, 115 So. 519 (1928). The heart of the present law is found in Florida Rule of Criminal Procedure 3.152(b). While that rule does not specifically mention antagonistic, defenses as a basis for severance of the trial of codefendants, the law still appears to countenance severance on that ground, but it is not a per se rule. As was stated in McCray and repeated in O'Callaghan, the object of the severance rule is not to provide defendants with an absolute right of severance when requested, when they blame each other for the crime, but to assure each of them of a fair determination of his guilt or innocence. 429 So.2d at 695 (quoting McCray, 416 So.2d at 806).
In the instant case, it was not so clearly a matter of Biscardi and Huhn each pointing his finger at the other as of Biscardi claiming his role was the result of Huhn's coercion and duress, while Huhn claimed not to have engaged in coercion and duress. If the jury can reasonably distinguish what the relevant evidence shows one codefendant did and said from what it shows another to have done and said, and can then apply the law intelligently to determine the guilt or innocence of each, severance is not needed. If the court in its discretion fears the jury will be confused or improperly *579 influenced by evidence that properly applies to another defendant, then it should grant severance. Id.
Thus, as the McCray court pointed out, while a severance is always required if the confession of one defendant implicates the one seeking severance, for fear the jury might tie the second defendant to the confession, in other circumstances the determination must be made case by case. 416 So.2d at 806. The fact that chances of acquittal would be enhanced by separate trial, or that there is hostility between the defendants, or that one tries to blame the offense entirely on the other, does not in itself require severance. Id. In appealing denial of a severance motion, the defendant must show a palpable abuse of discretion. Hanks v. State, 305 So.2d 817 (Fla. DCA 1974).
Biscardi's case differs from Florida cases mentioned above or otherwise known to the writer because he claims he would have mounted more forcefully a defense based on duress and coercion from Huhn in a severed trial. Biscardi uses the Connecticut cases of State v. Holup, 167 Conn. 240, 355 A.2d 119 (1974), and State v. Gordon, 170 Conn. 189, 365 A.2d 1056 (1976), to show he should have been granted his motion. Those cases involved a common kidnapping and robbery. Gordon's defense was that he took part only because Holup had coerced him at gunpoint and threatened the lives of him and his family. Holup did not testify, but Gordon gave testimony that was antagonistic to and incriminated Holup; in fact Gordon's testimony was apparently essential for the identification of Holup as the miscreant. The Connecticut court held Holup was prejudiced by the failure to sever, and reversed and remanded for new trial the convictions of both men. The court found that Gordon's defense as it developed at trial was predicated essentially on a confession and avoidance theory by which Holup was implicated in virtually every element of the crimes with which the two men were charged. Their defenses were therefore seen as both incompatible and entirely antagonistic to each other.
At first glance, one is tempted to view the present case as analogous to the above Connecticut cases. However, in the present case Holup's counterpart is presumably Huhn, who is not now appealing the failure to sever; Huhn did not testify that Biscardi committed the offenses, but only that Biscardi and Fiola asked him for help, and that he did not himself participate in any kidnapping or assault; and he hadn't seen anyone else beat up Fiola. Thus we do not think it can be said their defenses were antagonistic in the sense that Holup's and Gordon's were. Of course, Biscardi's full-press reliance on the coercion and duress defense could be perceived as prejudicial to Huhn, but Biscardi cannot assert injury to Huhn as a basis for granting Biscardi's severance motion. If the record fails to show that defenses were antagonistic, that cannot be the ground for a severance.
We have still not faced the fact that here Biscardi seems to be saying his defense of coercion and duress was prevented by the common trial, because his fear of retaliation persisted. If that is what he is saying, we do not think he has shown that he would not or could not have been adequately protected if he had pursued his defense theory more avidly. How do we know what course his defense really would have taken had severance been granted? Fiola, the victim of the instant crimes, claimed to be similarly in fear  apparently for good reason  but told his version of what happened anyway.
Biscardi incorrectly tries to analogize to Thomas v. State, 297 So.2d 850 (Fla. 4th DCA 1974). That case is distinguished by its facts. A packet of cocaine was found between Thomas' codefendant's legs, when both were in an automobile. This court found the question of whether one or both were in possession made their defenses inherently antagonistic. The case of United States v. Crawford, 581 F.2d 489 (5th Cir.1978), is similar to Thomas because it concerns the issue of possession of an illegal weapon in similar circumstances.
Biscardi also relies on United States v. Romanello, 726 F.2d 173 (5th Cir.1984). *580 There, severance was said to have been required even though the defenses were not wholly antagonistic. In the view of the Circuit Court of Appeal, as Biscardi informs us, it was enough that the defendants' defenses were irreconcilable and mutually exclusive  if one defendant accuses the other, and the other denies involvement. However, there were additional important conditions that made severance a necessity in Romanello, according to the appellate court, including that a codefendant actively attacked the appealing defendant's defense at trial, and the defendant suffered, as a result, "compelling prejudice." Indeed, it may be best to quote the full statement of the Romanello court's holding on this issue:
We hold that a defendant like Vertucci deserves a new, severed trial when:
1. the core of his defense is the guilt of his co-defendant;
2. to disprove his defense would establish his guilt;
3. his defense and the defense of his codefendant are irreconcilable and mutually exclusive;
4. the co-defendant actively attacks his defense at trial; and
5. he sufferes compelling prejudice as a result.
Such was the case here. A fair trial was impossible under the circumstances.
Id. at 181. One member of the three judge panel vigorously dissented, saying, in part with the support of cited authority, that implied accusations of one defendant by another defendant's lawyer do not render the defenses sufficiently antagonistic to compel severance. No direct accusation had taken place in Romanello.
We think in the instant case the defenses were not directly opposed to each other; and the facts were straightforward enough so that the jury could readily keep straight what evidence there was against the respective defendants, so that Biscardi was not prejudiced by having a common trial with Huhn and Mones. Biscardi has failed to show the denial of his severance motions was an abuse of discretion.

II

MOTION FOR SEPARATE JURY
The trial court denied Biscardi's motion that would have resulted in selection of two juries, one of which would decide on the charges against Huhn and Mones and the other on the charges against Biscardi. They would both hear the opening instructions and the direct examination of the state's witnesses, but cross-examination, redirect examination, and closing argument would be separate. General instructions would be given in common, but any needed special instruction would be given separately. Biscardi says this would have made it possible for him to assert his coercion/duress defense without fear of reprisal, as he would not be damaging Huhn's defense that Huhn was not involved in the kidnapping and assault. Biscardi reasons there would also be no appreciable added cost to the judicial economy.
Judicial economy is not the controlling factor for this issue, as it is not for severance. The reasoning discussed above on the severance issue reasonably applies equally here. If the defenses of codefendants are not so antagonistic as to necessarily result in prejudice to the movant, the trial court need not grant severance or a separate jury. The state points out further that at trial Biscardi never asserted he was still in fear of Huhn (as he stated when deposed prior to trial) until the next to the last day of the trial. We find no error as to the present issue.

III

JURY INSTRUCTION RESPECTING REINSTRUCTION AND REVIEW OF TESTIMONY
The appellant contends that when the trial court told the jury "there is really no provision" for reinstruction or to have testimony read back, and particularly in view of the trial court's early-on refusal to advise the jury they could take notes, the court committed reversible error. We think he is correct.
*581 In Kozakoff v. State, 323 So.2d 28 (Fla. 4th DCA 1975), this court pointed out the dangers of an informal and unstructured approach to jury instruction. The facts there involved a statement by the trial judge during voir dire that, "We have to make decisions," going on later to "basically I want a verdict, I want people to go back there and have them made their minds up on something." This court considered this to be a premature Allen charge, prejudicing the appellant's right to have a hung jury, and warranting reversal of the conviction and remand for new trial.
The instant facts are not necessarily the equivalent of an Allen charge, as they do not say or imply the jury must come to a verdict. To read that meaning into the statement being attacked is stretching the meaning unreasonably. Nevertheless, the judge's words may reasonably have conveyed to jurors that to ask for clarification of instructions or rereading of testimony would be futile. As a result they may have reacted as they did because they misapprehended the law or had a distorted recollection of some of the testimony.
The state points out that rule 3.410, Florida Rule of Criminal Procedure, leaves reinstruction to the judge's discretion, and from this argues that the above comment to the jury was not error; or, if error, then harmless, because appellant is unable to show prejudice. Obviously, without going into the jurors' heads or their communication with each other appellant cannot demonstrate prejudice.
Under similar circumstances, declaration of a mistrial in a civil case has been upheld. Cedars of Lebanon Hospital v. Silva, 476 So.2d 696 (Fla. 3d DCA 1985). While recognizing that affirmance of an act of the court in a civil case is based on a different standard from reversal of a criminal case for failure to do likewise, we think, because of the stakes involved, the instant court comment was prejudicial and therefore reversible error.
As to the ruling on the notetaking, appellant points out that many federal courts allow jurors to take notes but give an instruction on the proper use of such notes. The state bases its position, that the court properly refused to advise the jurors they could take notes, on the principle, stated in numerous cases it cites, that jury deliberations should not include matters not presented in evidence. The state theorizes a juror's notes may incorporate his or her subjective views. This reasoning is unimpressive, as jurors are free to express their personal views to each other during deliberations. Deliberations should not include suppositions, rumor or street-knowledge, Rolle v. State, 449 So.2d 1297, 1299 (Fla. 4th DCA 1984), but we need not assume a juror's notes would contain any of these, particularly if a proper cautionary instruction were given.
We do not suggest the court erred in refusing to advise the jury they could take notes, but feel that the fact the court so refused could have aggravated the impact of the later comment that suggested there could be no reinstruction or rereading of testimony.

IV

INCOMPLETE COERCION INSTRUCTION
If any evidence has been adduced that supports a coercion and duress defense the defendant is entitled to have an appropriate jury instruction given. See Koontz v. State, 204 So.2d 224, 227 (Fla. 2d DCA 1967). In the instant case Fiola's testimony indicating Biscardi may have acted as he did in connection with the criminal acts charged because of threats from Huhn led the court and counsel to agree that such an instruction should be given. The state suggested the instruction follow that approved in Koontz v. State, and presented a writing the prosecutor had prepared as a defense counsel in an earlier case which does follow that language. Defense counsel had proposed a different wording, but apparently accepted the prosecutor's offering. After the jury was given the instruction, Biscardi complained because although the instruction given mentioned that coercion by the use or threatened use of physical force on the defendant was a defense, it *582 failed to mention the equal validity of a coercion defense based on use or threat of use of physical force on his family, which in the cases has been referred to as "upon a third person." See, e.g., Hall v. State, 136 Fla. 644, 187 So. 392 (1939).
Biscardi thinks this omission was reversible error because so much of Fiola's testimony referred to threats to Fiola's and Biscardi's families.
In Koontz there had been threats and physical force applied, according to testimony, to the defendant; but there had also been threats of bodily harm to his sister and his mother. The instruction, however, which was requested by the defendant, was not given by the trial court, but was approved on appeal; did not refer to threats to these others, but only to compulsion and coercion applied to the defendant himself such that he reasonably believed there was real, imminent and impending danger to him. The state reasons that since the Koontz instruction did not mention threats to a third person's safety, the present instruction, which is similar, must be adequate.
Such reasoning is faulty. All that the Koontz court's approved instruction tells us in this regard is that Koontz's counsel neglected to include a reference to coercion by threat to a third person's safety. Had Koontz' counsel mentioned that in the proposed instruction it would surely have been approved by the appellate court. The lack of such a reference in Koontz does not mean it is unnecessary to include it if the evidence points at the possible presence of such a threat.
We hold that failure to correct the omission of this reference from the instruction when called to the court's attention was reversible error. Biscardi was entitled to an instruction on the defense of coercion by threat of harm to his family, and not merely to him.

V

COMMENT THAT JURY PROBABLY HAS ALREADY DECIDED ABOUT VERDICT
This issue was also raised by Huhn and is discussed in the Huhn opinion. We think Biscardi has read more into the comment than is there. Taken in context, what the court seems to have been saying, and very probably conveyed, is that although each of the jurors likely already has formed an opinion about the guilt or innocence of the defendants and the nature of the crimes involved, the judge had to carry out his responsibility of acquainting the jurors with the pertinent law. It is another example of offhand remarks that can cause problems, but we think no harm was done.

VI

COURT'S STATEMENTS ABOUT THE PROCEDURES RELATING TO VERDICT FORMS
It is true that Kozakoff, cited earlier, and other cases affirm the defendant's right to a hung jury, and take a dim view of a premature Allen charge. However, the statements cited by no means imply that the jury must come in with a verdict. All the court was doing was to describe some of the duties of the foreman, point out the need for unanimity in a verdict and state what would happen when the jury came back having reached its verdict. It takes a fertile imagination to read into such a recitation a charge that the jury absolutely must come to a verdict. From the fact the judge said he would discharge the jury after the verdict had been appropriately received, we cannot reasonably suppose the jury inferred it must reach a verdict.
HERSEY, C.J., concurs.
DOWNEY, J., concurs specially with opinion.
DOWNEY, Judge, concurring specially.
I agree with the majority opinion's conclusion that this cause should be reversed for a new trial because the coercion instruction, which was vital to Biscardi's defense, was not complete.
I do not consider the trial judge's peremptory instruction that no questions from the jury or rereading of testimony would *583 be considered by the court to be reversible error absent some demonstration of prejudice. However, it is not a recommended practice and should not be followed.